**UNITED STATES of America ex rel. Frank ALERTE, Jr., Petitioner,**

v.

**Michael LANE, et al., Respondents.**

**No. 89 C 2471.**

United States District Court, N.D. Illinois, E.D.

Aug. 30, 1989.

Randolph N. Stone, Public Defender of Cook County, Ronald P. Alwin, and Evelyn G. Baniewicz, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., and Michael J. Singer, Asst. Atty. Gen., State of Ill., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Frank Alerte, Jr. petitions for habeas corpus relief under 28 U.S.C. § 2254. Alerte is in the state penitentiary serving a 30 year sentence for murdering a fellow-student at DePaul University. His conviction was affirmed on direct appeal. *People v. Alerte*, 120 Ill.App.3d 962, 76 Ill.Dec. 452, 458 N.E.2d 1106 (1st Div.1983). The Illinois Supreme Court denied Alerte leave to appeal. It is undisputed that Alerte exhausted his state remedies.

Alerte contends that he was denied a fair trial and due process of law as the combined result of the prosecutors' closing arguments and the trial judge's refusal to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. For the reasons that follow, the petition is granted.

### PROCEDURAL DEFAULT

The state's principal argument is that Alerte's due process and fair trial claim is barred because in his direct appeal, he

raised the above claim as a matter of mere trial court error and did not rely on the federal constitution in any way,

shape or form ... [and he] has procedurally defaulted any right to raise this claim.

Respondents' memo. at 3. The state's argument is predicated on the rule that a habeas petitioner must provide the state courts with a fair opportunity to apply constitutional principles and to correct any constitutional error committed by the trial court. *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 (7th Cir.1984).

In the brief Alerte submitted to the state appellate court, however, he contended that he

... should be granted a new trial because both prosecutors repeatedly commented on matters not material to the question of guilt or innocence in their arguments to the jury. As a whole, the prosecution's arguments manifest a deliberate attempt to prejudice and inflame the jury and to divert the jurors' attention from the closely contested issue of defendant's sanity. *These statements infringed upon defendant's* State and *Federal right to a trial by jury and denied defendant due process of law.* (U.S. Constitution, Amendments 6 & 14; Illinois Constitution, Article 1 sec. 13.)

Exhibit to petitioner's response to answer at 59 (emphasis supplied). Here, Alerte contends that the same prosecutorial statements in closing arguments, combined with the trial court's failure to sustain objections to these improper statements and failure to give a curative instruction, deprived him of a fair trial and due process of law in violation of the sixth and fourteenth amendments of the United States Constitution. Petition at ¶¶ 37–45.

The state belatedly recognizes that Alerte adequately asserted the deprivation of a federal constitutional right in the state appellate court with respect to his claim of prosecutorial misconduct. Respondents' reply at 11. However, the state misdefines this habeas petition to include only the trial court's failure to instruct the jury about the consequences of an acquittal by reason of insanity. *Id.* This is not a fair or reasonable reading of the petition. Quoted

prejudicial and inflammatory prosecutorial statements are central to the petition; the failure to give an instruction that would have dispelled or ameliorated the prejudicial impact of the improper prosecutorial comments is an aggravating circumstance that supports the federal constitutional claim asserted. Petition at ¶ 45. The state appellate court had a fair opportunity to apply constitutional principles to substantially the same claim presented here and to correct any constitutional error. The fact that Alerte may have organized his arguments differently in his state appeal is insignificant. The issues he raises now were raised in his direct appeal, however articulated. Accordingly, the state's procedural default argument lacks merit.

### FACTS

This court is bound by 28 U.S.C. § 2254(d) to presume the factual issues determined by a state court are correct. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The state appellate court's summary of the facts serve as the basis for review. *Smith v. Fairman,* 862 F.2d 630, 632 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989).

Although there were no eyewitnesses to the murder, the state presented substantial circumstantial evidence placing Alerte with the victim at the time of death. Shortly before the murder, Alerte was seen pacing outside a school dormitory with an envelope or papers in his hands. Alerte then walked inside and sat down near where the victim was playing ping-pong without saying hello and began looking through the papers with a pensive expression. Alerte was later seen supporting the victim against the exterior wall of a dormitory near the bushes where the victim's body was found. Alerte was also seen leaving the area quickly with his left hand pushing something that appeared to be a weapon into his pocket. A medical examiner for Cook County testified that the victim died from 25 stab wounds to the back, head and chest. Alerte was arrested later that evening; he gave an exculpatory statement

and answered questions in a coherent and intelligent manner.

At trial, Alerte relied almost entirely on a defense of insanity, presenting in detail his long history of psychiatric treatment and hospitalizations and his continued pattern of violent, assaultive behavior. Alerte's mother testified that when her son was five years old, she sought help for him from a child psychiatrist upon the recommendation of his school psychologist. Alerte was eventually dismissed from the school due to his aggressive behavior. Alerte's mother testified that he was expelled from six schools due to behavior problems, he saw at least a dozen psychiatrists and psychologists, he spent time in at least six mental hospitals and ran away from home repeatedly. His mother and other defense witnesses described specific violent incidents: Alerte struck a grade school classmate with a rock, hit a neighbor's son with a hammer, set fire to his house, attacked a young man he had never met before on a train platform, struck a co-worker over the head with a metal pipe, and stuck a knife in the back of a woman hired to care for Alerte's younger brother. Other witnesses testified about incidents when Alerte behaved violently or aggressively and seemed like a different person: his facial expression changed, his strength doubled, showing no remorse and offering no explanation.

Each side produced two expert witnesses on the issue of sanity. Alerte called Dr. Frederic A. Gibbs, an expert in the field of epilepsy and electroencephalography, who testified that he first met Alerte in 1965 when Alerte was 11. At that time, Dr. Gibbs administered and read Alerte's electroencephalogram (EEG), which was abnormal and revealed a type of seizure activity in the part of the brain that controls emotions. Dr. Gibbs stated that this type of abnormality does not produce convulsions; two percent of the population with this abnormality have rage attacks during which they cannot control their actions or exercise normal judgment. Based on Alerte's EEG and history, Dr. Gibbs believed Alerte suffered from this condition. Alerte's 1969 EEG, administered and read by Dr. Gibbs, showed the same abnormality with some improvement. However, on that day Alerte suddenly grabbed Dr. Gibbs' necktie and, with a display of unusual strength, dragged Dr. Gibbs toward an open window. A friend of Dr. Gibbs grabbed Alerte and helped quiet him down. In Dr. Gibbs' opinion, this incident was a rage attack. According to Dr. Gibbs, epileptics and people who have rage attacks may have normal EEGs. Following a normal EEG in 1977, Dr. Gibbs referred Alerte to Dr. Frank Lorimer. Dr. Lorimer, a psychiatrist, testified that Alerte suffered from limbic epilepsy, a category of epilepsy gaining medical recognition. Limbic epilepsy is characterized by rage attacks and blackouts. Dr. Lorimer testified that at the time of the murder, Alerte was undergoing a distinct rage attack that prevented him from appreciating the criminality of his behavior or conforming his conduct to the requirements of the law.

In rebuttal, the state called Dr. John Hughes, a specialist in electroencephalography and epileptology. Dr. Hughes found one of Alerte's five EEGs considered abnormal by Dr. Gibbs as normal. Dr. Hughes testified that Dr. Lorimer's diagnosis did not appear in the manual containing acceptable psychiatric diagnoses and that limbic epilepsy is not a term commonly understood and agreed upon by the world neurological community. Dr. Robert Reifman, a psychiatrist for the Circuit Court of Cook County, testified that Alerte did not suffer from any mental disease or defect at the time of the murder. Dr. Reifman diagnosed Alerte as having a narcissistic personality that is consistent with problems in school and violent episodes. In Dr. Reifman's opinion, Alerte's personality disorder did not prevent Alerte from appreciating the criminality of his conduct or conforming his conduct to the requirements of the law.

During closing arguments, the prosecutor described Alerte's insanity defense as a fraud and opined concerning Dr. Lorimer that "he is to me the epitome of what criminal defenses can be brought down to in the criminal justice system." R. 1141. Defense counsel did not object until the prosecutor described the effect of a finding of insanity.

Mr. Goggin: Are we going to let Frank Alerte skate? Are we going to let him get a slap on the wrist again[1] and walk out of this courtroom and—

Mr. O'Donnell: Objection.

Mr. Goggin: (continuing)—and scoff at all of us?

The Court: Punishment is left up to me.

Mr. Goggin: Let him laugh at all of us and escape responsibility? Let him laugh at the Kelly family, a family that no longer has their son, their brother, the baby of the family, the tennis player, the kid with the future, who had a scholarship to college? Tell the Kelly family, "Forget it, forget it." We are going to slap him on the wrist and let him walk out because of somebody like Frank Lorimer?

R. 1143.

During his closing argument, defense counsel unsuccessfully attempted to respond to the prosecutor's statement concerning the effect of a finding of insanity:

Mr. O'Donnell: The judge told you initially, ladies and gentlemen, that you are not to concern yourselves with what occurs to this man if he's found not guilty by reason of insanity,[2] because the law does protect you on that.

Mr. Goggin: Objection to that, Judge.

Mr. O'Donnell: He talked about escape, walking out of here.

The Court: Counsel, I haven't ruled on the objection. Objection sustained.

R. 1158.

In rebuttal, a different prosecutor discussed Alerte's insanity defense and the effect of a verdict of guilty.

Mr. Owen: Your job is not to evaluate the pluses or minuses of mental health programs of our society; of whether or not we treat mental patients in a good or bad or indifferent manner. Your job is not to determine whether or not what happened to him will deter others, but let me just say this on that point; *that there's one deterrent when you find him, that guy, guilty of murder. The deterrent is that he will not get the opportunity to murder anybody else. That's the deterrent.*

Mr. O'Donnell: Object to that, and that's not the law.

The Court: Jury heard the evidence.

R. 1165–66 (emphasis supplied).

The rebuttal prosecutor went on to accuse Alerte's parents as being accomplices, and to infer a homosexual jealousy motive for the murder and a profit motive for defense counsel.

Mr. Owen: There should be two more chairs seated right next to that guy, and that's for his parents. They should be on trial here, too, because it was them, along with him, that caused the death of [the victim] and there's no insanity—

Mr. O'Donnell: Object to this.

Mr. Owen: (continuing)—in this case.

The Court: Fair comment, Counsel.

Mr. Owen: You know, Dr. Lorimer was the guy that got up here and told you that this guy here is insane. The same guy, the very same guy, the defendant, that knew every single thing he did that day from 12:29 when he left the law

---

**1.** The cross-examination of Alerte's mother indicates that her son was rarely punished or disciplined after his violent attacks. Rather, his parents' response was to seek help from psychiatrists or mental hospitals. The jury heard that within the previous three years, Alerte had been arrested for attacking a man on a train platform (R. 578) and convicted of battery for striking a co-worker (R. 916). There was no indication that Alerte was incarcerated for these offenses.

**2.** The trial record contains only one statement by the judge regarding the consequences of a guilty verdict. While addressing the prospective jurors prior to voir dire, eight days before closing arguments, the judge informed the jury that the State would not be seeking the death penalty.

All you are going to have to decide is whether or not the defendant is guilty or not guilty of the charges. Any punishment will be left solely to me, and it's only if the State proves the case beyond a reasonable doubt. So, there is no problem regarding capital punishment. Any punishment, if the defendant is proved guilty beyond a reasonable doubt, will be solely up to me and nobody else. So, you don't have to worry about that.

R. 258.

firm, to when he went to the library, to after he got to the library when he went and saw [the victim] playing ping-pong. Wasn't that interesting? [The victim] was playing ping-pong with someone other than him, someone other than this guy.

So, the guy brooded. He sat there. His friend was playing ping-pong with someone else. Now, you can draw any inference you want from that, and you know something else about that guy "Frankie," that 26–year old man who's called "Frankie" by this defense attorney during the entire course of this trial?

You know that he played tennis at the Mid-town Racket Club, and who paid? Who paid for [the victim's] tennis? Him. Now, you can draw any inference you want from that, too, and I'll tell you something else, and Mr. Goggin already told you that we don't have to prove a motive, because I cannot get inside that man's vicious mind and tell you what happened when he and [the victim] left Corcoran Hall and he decided something about [the victim], something that [the victim] said or something that he wanted to do that [the victim] wouldn't go along with—

Mr. O'Donnell: Object to that.

Mr. Owen: He got upset.

Mr. O'Donnell: Absolutely no evidence—

The Court: Overruled.

Mr. Owen: He got upset and what did he do? He lashed out like he's done all his life when people don't agree with him. He's a spoiled, rotten little brat, and it frosts me to hear somebody get up here and tell you, "We don't care about our sick." Well, I care about our sick. I've got a retarded uncle and I care about him a lot, but I don't care about him, because he's a killer, and I'll do my best to send him where he belongs, and if that means getting upset, I'll tell you I'll get as upset as I have to get, because it really irritates me to hear final arguments like that.

Mr. O'Donnell gets up here and tells us, I wouldn't take this case; I wouldn't take this case but for the fact that I want to present the truth. This is why he took the case, right here. Who's kidding who?

Mr. O'Donnell: Object to this and I think it is highly improper.

Mr. Owen: For money.

The Court: Overruled.

R. 1167–69.

Before finishing the rebuttal argument, the prosecutor again argued the effect of a finding of insanity without objection from defense counsel:

Mr. Owen: ... and the law says this: If he does have a mental disease or defect, and because of this if he cannot appreciate the criminality of his act, or conform his conduct to the requirements of the law, *then you can cut him loose....*

R. 1176 (emphasis supplied).

The prosecution submitted 14 instructions that were read to the jury, but did not include any that cautioned the jury to disregard the effect of their verdict. The defense proposed a single instruction that was taken verbatim from Ill.Rev.Stat. ch. 38, ¶ 1005–2–4(a) & (b), relating to confinement to a mental hospital after an acquittal by reason of insanity. The defense's proposed instruction was refused.

The state appellate court found that the prosecutor's personal opinions concerning Alerte, the defense witnesses and the insanity defense were improper; the inference of homosexual jealousy as a motive was improper; and the comments mischaracterizing an acquittal by reason of insanity were improper. However, the court concluded that none of these statements affected the verdict and were not the type of comments that warrant a new trial. *Alerte*, 76 Ill.Dec. at 457–58, 458 N.E.2d at 1111–13. The state appellate court also found that the prosecutor's comments concerning defense counsel's profit motive were invited and thus proper; and that all other improper comments not objected to were waived. *Id.* These findings raise issues of law and mixed questions of law and fact that do not command a presumption of correctness under 28 U.S.C. § 2254(d). *See Sumner v. Mata*, 455 U.S.

591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982).

## DISCUSSION

■ Alerte contends that the prosecutors' closing arguments in conjunction with the failure of the trial court to give the requested instruction on the consequences of a verdict of not guilty by reason of insanity deprived him of a fair trial and due process of law. Petition at ¶ 12. To warrant relief on this ground, this court must find the prosecutors' remarks, viewed in isolation, were improper and that the improper remarks, viewed in context of the entire case, infected the trial with unfairness to such a degree that the outcome would likely be different if the remarks had not been made. *United States v. Hernandez*, 865 F.2d 925, 927–28 (7th Cir. 1989). In assessing the effect of the improper remarks on the trial, the factors to be considered are the nature and seriousness of the prosecutorial misconduct, whether the comments are invited by defense counsel, whether the trial court issued curative instructions, whether the defense was able to respond to the improper arguments, and the weight of the evidence against the defendant. *United States v. Pirovolos*, 844 F.2d 415, 426 (7th Cir.1988) *citing Darden v. Wainwright*, 477 U.S. 168, 181–83, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986).

■ Alerte's petition cites three improper prosecutorial remarks that were objected to by defense counsel. First, the characterizations of an acquittal by reason of insanity as allowing Alerte to "skate," "walk out ... and scoff," "escape responsibility," and "a slap on the wrist and let him walk out" were misrepresentations of the law. The prosecutors were apprised of the law concerning involuntary confinement in a mental hospital for such acquittals by defense counsel's proposed jury instructions immediately preceding the closing arguments. R. 1115. Similarly improper was the remark by the rebuttal prosecutor that "there's one deterrent when you find him ... guilty of murder ... he will not get the opportunity to murder anybody else. That's the deterrent." These remarks are cause for reversal where they are an invitation to the jury to convict, even though it might believe the defendant to be insane, in order to keep the defendant off the streets and away from society. *United States v. Jackson*, 542 F.2d 403, 411 (7th Cir.1976).

Finally, the third remark complained of by Alerte is the suggestion by the rebuttal prosecutor that the murder was motivated by homosexual jealousy. There was no evidence introduced at trial that Alerte was homosexual or that there was any sexual relationship between Alerte and the victim. This remark seems particularly egregious in light of the fact that immediately prior to closing arguments, the prosecutors were informed that the jury would be instructed that no motive was necessary to find Alerte guilty of murder. The prosecutor's purpose in implying a homosexual motive can only be construed as outside the record and intentionally inflammatory. *See United States ex rel. Clark v. Fike*, 538 F.2d 750, 760 (7th Cir.1976).

There were other improper prosecutorial statements that were not objected to by defense counsel or are not raised in this petition. The prosecutor referred to the insanity defense as a "fraud" and mocked Alerte's psychiatrist. The rebuttal prosecutor made statements that Alerte's parents were equally guilty, that he (the prosecutor) cared about his own retarded uncle, that defense counsel took the case for money, and that a verdict of insanity would "cut [Alerte] loose." Alerte does not request—and this court does not decide— whether these remarks rose to the level of plain error. However, when analyzing the effect of the three improper remarks Alerte relies on, these additional comments must be considered in evaluating whether Alerte received a fair trial. *Hernandez*, 865 F.2d at 927.

■ Prosecutorial misconduct that does not directly violate a criminal defendant's constitutional rights may still deny him a fair trial if they are repeated or emphasized. *Compare Jackson*, 542 F.2d at 403 (new trial not required where prosecutor

referred to item not in evidence and result of insanity plea in passing), *with United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978) (new trial granted where prosecutor made repeated allegations unsupported by evidence and misstated the law). The prosecutors in this case made three statements overtly suggesting that an acquittal by reason of insanity would set a violent, irrational man free and that a verdict of guilty would not. In the context of a trial involving a brutal murder and significant testimony concerning Alerte's history of irrational violence, the prosecutors' repeated remarks were particularly prejudicial.

The prosecutors' arguments are the core of Alerte's petition. Improper statements concerning the result of a finding of insanity were not invited. The first two remarks came before defense counsel's closing argument. Objections to these improper comments were not sustained. In contrast, defense counsel was not allowed to effectively respond to these comments. An objection by the prosecution to defense counsel's attempt to address the issue was sustained. Had the prosecution's objection been overruled, the prosecutorial remarks may have had a less prejudicial impact. *See People v. Myers*, 35 Ill.2d 311, 220 N.E.2d 297, 311 (1966). With respect to the rebuttal prosecutor's allegation that defense counsel's motive for taking the case was solely for money, it is noted that the invited response doctrine does not make an improper remark proper, but rather is weighed against the improper invitation when determining its effect. *United States v. Young*, 470 U.S. 1, 11–14, 105 S.Ct. 1038, 1044–46, 84 L.Ed.2d 1 (1985).

■ Prosecutorial misconduct that is promptly and vigorously corrected by the judge is not reversible error. *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir.1986) (misconduct was not reversible error when several objections were sustained and judge told jury to disregard objectionable remarks). During Alerte's trial, however, none of the defense objections were sustained nor were the prosecutors' improper statements mitigated by a curative instruction. After defense counsel's first objection, the court merely responded, "Punishment is left up to me." Although admonitions to the jury will be presumed to be taken seriously, *Mazzone*, 782 F.2d at 764, the jury cannot reasonably be presumed to have understood this as an admonition when the prosecutor repeated the improper remark shortly thereafter. The judge's response likely confused the jury and did not mitigate the prejudicial impact of the prosecutor's remarks. In addition, when the rebuttal prosecutor argued that a verdict of murder would keep Alerte from murdering again, the court responded to defense counsel's objection by saying, "Jury heard the evidence." At best, this remark is ambiguous. It could easily have been construed by the jury to mean that they could consider the deterrent effect of a guilty verdict. A curative instruction to the jury at the close of arguments mitigates the effect of prosecutorial misconduct. *Jackson*, 542 F.2d at 411–12. None was given.

■ Even grossly improper statements by a prosecutor will not require a new trial when the evidence of guilt is overwhelming. *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472. The burden is on Alerte to establish that "but for the prosecutorial misconduct the outcome of the trial would have been different." *Shepard v. Lane*, 818 F.2d 615, 622 (7th Cir.1987). The state appellate court found that the jury heard "sufficient evidence to find that [Alerte] was sane." *Alerte*, 76 Ill.Dec. at 458, 458 N.E.2d at 1112. However, adequate consideration was not given to the entire record. The prosecutors' remarks were particularly prejudicial because the defense relied heavily on the insanity issue and that issue was hotly contested. Alerte's insanity defense was not based on a temporary condition. Alerte was seen by numerous psychiatrists and psychologists since he was five years old, he spent time in several mental hospitals and he was prescribed medication to control his violent behavior. Both sides presented qualified expert witnesses to testify on the insanity issue. Evidence of sanity was far from overwhelming.

The jury heard a great deal of testimony about Alerte's history of violent and assaultive behavior. In their arguments, the prosecutors exploited the justified fears of the jurors by repeatedly arguing that a verdict of not guilty by reason of insanity would free a dangerous person and that the only way to prevent him from committing another brutal murder was a verdict of guilty. "The threat is always present that the jury's consideration of the evidence will be affected by their fear that a finding of insanity will result in a defendant being set free." *Jackson*, 542 F.2d at 412. The prosecutors deliberately and repeatedly exploited this fear. The trial judge did not intervene or give any curative instructions. Defense counsel was not permitted to respond to these inflammatory and prejudicial remarks or to have the jury instructed on the effects of a finding of insanity.[3] Under these circumstances, the prosecutors' improper comments likely affected the jury's decision. Alerte was denied a fair trial.

## CONCLUSION

Alerte's petition for a writ of habeas corpus is granted. Execution of the writ is stayed on the condition that the State of Illinois grant petitioner a new trial within a reasonable time not to exceed 120 days.

---

**3.** This decision should not be read as requiring a jury instruction on the state-mandated commitment procedures following an acquittal by reason of insanity. That instruction is not required by Illinois law, *People v. Meeker*, 86 Ill. App.3d 162, 170, 41 Ill.Dec. 560, 567, 407 N.E.2d 1058, 1065 (1980), nor is it required by due process. *United States v. Greene*, 497 F.2d 1068,

1077 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).