In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2314

Jamaljah Aliwoli,

Petitioner-Appellant,

v.

Lamark Carter, Warden,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 2283--Suzanne B. Conlon, Judge.

Argued June 9, 2000--Decided August 29, 2000

Before Bauer, Posner, and Rovner, Circuit Judges.

Bauer, Circuit Judge.  After being stopped for a routine traffic violation, Jamaljah Aliwoli pulled a gun from his jacket and shot three Chicago police officers. Fortunately, all three police officers survived the shooting. At Aliwoli's trial on three counts of attempted first degree murder, Aliwoli claimed that he was not guilty by reason of insanity. To substantiate his insanity defense, Aliwoli presented three expert witnesses who testified that Aliwoli suffered from a persecutorial delusional disorder that caused him to believe that police officers were members of a conspiracy to harass him. The experts testified that, because of his delusional disorder, Aliwoli was unable to conform his conduct to the requirements of law when he shot the police officers.

The jury rejected Aliwoli's insanity defense and found him guilty but mentally ill. The trial judge sentenced Aliwoli to prison terms of 60 years, 30 years, and 30 years on the three convictions, with each sentence to run consecutively. Aliwoli appealed to the Illinois Appellate Court and that court affirmed his convictions and sentences. See People v. Aliwoli, 606 N.E.2d 347 (Ill. App. Ct. 1992). Aliwoli then sought leave to appeal to the Illinois Supreme Court, but that request was denied. See People v. Aliwoli, 610 N.E.2d 1267 (Ill. 1993). Aliwoli

never petitioned for post-conviction relief in the Illinois courts.

Having exhausted his state court options, Aliwoli filed a petition for a writ of habeas corpus under 28 U.S.C. sec. 2254 and the district court denied that petition. See United States ex rel. Aliwoli v. Peters, No. 96 C 2283, 1996 WL 666692 (N.D. Ill. Nov. 14, 1996). Aliwoli appealed the ruling to this court, arguing that the district court's decision should be reversed because the district judge had erroneously applied the standards of sec. 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132. We agreed with Aliwoli's argument and held that, since Aliwoli filed his petition before the effective date of the AEDPA, the district court should have considered his claims under the pre-AEDPA standards. See Aliwoli v. Gilmore, 127 F.3d 632, 633 (7th Cir. 1997). We remanded the case to the district court to consider Aliwoli's petition under the pre-AEDPA standards. We did, however, affirm the district court's determination that Aliwoli procedurally defaulted his claim that the prosecutor made improper remarks during rebuttal argument.

On remand, the district court issued a minute order denying Aliwoli's petition for a writ of habeas corpus. Applying the pre-AEDPA standards, the district judge found no constitutional error in his trial. Aliwoli now challenges the district court's ruling under the pre-AEDPA standards.

Under the habeas statute in effect before the AEDPA, a federal court exercising habeas corpus jurisdiction could grant relief to a petitioner in custody pursuant to the judgment of a state court only if his custody violated federal statutory or constitutional law. Milone v. Camp, 22 F.3d 693, 698 (7th Cir. 1994); Escobar v. O'Leary, 943 F.2d 711, 720 (7th Cir. 1991). We review the district court's conclusions of law de novo, Quinn v. Neal, 998 F.2d 526, 528 (7th Cir. 1993), and presume the facts as found by the state courts to be correct. Brewer v. Aiken, 935 F.2d 850, 855 (7th Cir. 1991).

Aliwoli first contends that he was deprived of a fair trial when, during closing argument, the prosecutor said "what they are trying to do ladies and gentlemen is flimflam you so that he can go laughing out that door of this courtroom."[1] According to Aliwoli, this statement was improper because the prosecutor was implicitly arguing that a verdict of not guilty by reason of insanity would result in Aliwoli's total release from custody. Aliwoli asserts that the prosecutor's remark unfairly prevented the jury from finding him not guilty by reason of

insanity and therefore deprived him of due process.

When scrutinizing a prosecutorial statement made during closing argument, we first analyze the remark in isolation to determine whether it was improper. See United States v. Miller, 199 F.3d 416, 422 (7th Cir. 1999). If the prosecutor's statement was inappropriate "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also United States v. Cusimano, 148 F.3d 824, 831 (7th Cir. 1998). When assessing whether a prosecutor's statement deprived a defendant of a fair trial, we look to five factors: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether the prosecutor's statement was invited by the conduct of defense counsel; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant. United States v. Butler, 71 F.3d 243, 254 (1995).

When viewed in isolation, the prosecutor's remark was inappropriate. The prosecutor suggested that a not guilty by reason of insanity verdict would allow Aliwoli to "go laughing out that door of this courtroom." We have previously held that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored." United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997). As the Supreme Court explained in Shannon v. United States, 512 U.S. 573, 579 (1994), courts should withhold information about punishment from the jury because the jury's role is typically restricted to deciding whether the defendant is guilty of the crime charged. Id. Since the jury only determines whether the defendant is guilty or not guilty, "providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Id.; see also Evalt v. United States, 359 F.2d 534, 545-46 (9th Cir. 1966). Here, the prosecutor's comment was inappropriate because it raised the issue of the punishment (or lack thereof) that Aliwoli would receive by suggesting that Aliwoli would "go laughing out that door" if the jury found him not guilty by reason of insanity.

Even though we agree that the prosecutor's remark was inappropriate, we must still determine whether the comment caused sufficient prejudice

so as to deprive Aliwoli of due process. Applying the relevant factors, we cannot say that Aliwoli was deprived of a fair trial. The statement was improper but not "highly inflammatory." See Cunningham, 54 F.3d at 301. Moreover, the trial judge firmly and correctly instructed the jury that "you are not to concern yourselves with possible punishment or sentence for the offense charged during your deliberations." The trial judge also advised the jury that "neither opening statements nor closing arguments are evidence and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

And, importantly, Aliwoli's attorney had an opportunity to refute the prosecutor's suggestion that a not guilty by reason of insanity verdict would allow Aliwoli to go free. Specifically, Aliwoli's attorney argued to the jury, "don't be misled by anyone telling you that he will walk out of that door if you find him not guilty by reason of insanity. That is not true." Aliwoli's attorney also told the jury that "these police officers as they sit right before you won't be in danger of this man ever again."

Finally, the weight of the evidence against Aliwoli was very convincing. Aliwoli admitted shooting the three police officers, but raised his mental state as a defense to the crime. Aliwoli had experts testify in support of his defense; however, there were several facts in the record indicating that Aliwoli acted calmly and deliberately. The jury could have reasonably inferred from these facts that Aliwoli was not insane when he committed this crime. Viewing Aliwoli's trial as a whole, and considering the relevant factors, we hold that the prosecutor's comments did not deprive Aliwoli of a fair trial. The district court correctly ruled that there was no constitutional violation when it rejected this argument. See Cunningham, 54 F.3d at 300-01; United States v. Greiser, 502 F.2d 1295, 1297-98 (9th Cir. 1974); United States v. Tankersley, 492 F.2d 962, 968 (7th Cir. 1974).

Aliwoli next claims that he was denied due process during his trial because the prosecutor questioned witnesses about his religious beliefs as a black Muslim. The prosecution apparently sought to establish that Aliwoli's membership in the black Muslim faith gave him a motive to shoot the three police officers. For example, the State cross-examined two of Aliwoli's expert witnesses by asking whether Aliwoli's black Muslim faith encompassed an anti-authority stance. The prosecutor also asked whether black Muslims have a negative view of the police and inquired about a black Muslim newspaper during the late 1960's

and early 1970's that referred to police officers as "pigs" and white people as "white devils." The prosecutor queried whether one expert was familiar with a 1984 article in American Psychologist Publication that suggested that many African-Americans consider white people as potential enemies. Finally, the prosecutor also asked one expert about a statement in her psycho-social history of Aliwoli where she wrote, "although a Muslim, he did not seem to be excessively hostile towards whites." Aliwoli insists that these references to his race and religion deprived him of a fair trial.

"There is no place in a criminal prosecution for gratuitous references to race . . . Elementary concepts of equal protection and due process alike forbid a prosecutor to seek to procure a verdict on the basis of racial animosity." Smith v. Farley, 59 F.3d 659, 663 (7th Cir. 1995). The Constitution "prohibits a prosecutor from making race-conscious arguments since it draws the jury's attention to a characteristic that the Constitution generally demands that the jury ignore." United States v. Hernandez, 865 F.2d 925, 928 (7th Cir. 1989). Like any charge of prosecutorial misconduct, we first view the statements to determine whether they were improper. If they were inappropriate, we view the record as a whole and consider whether they deprived the defendant of a fair trial. Id. at 927.

We find no constitutional error in the prosecutor's questions. As a general rule, a racial remark is improper if it is "intentionally injected into volatile proceedings where the prosecutor had targeted the defendant's ethnic origin for emphasis in an attempt to appeal to the jury's prejudices." Hernandez, 865 F.2d at 928. It is apparent from the context of the prosecutor's questions that the references to Aliwoli's membership in the black Muslim faith were only meant to show that Aliwoli had a motive for shooting the police officers. In other words, the questions were clearly intended to rebut Aliwoli's insanity defense. Because the questions about Aliwoli's beliefs as a black Muslim focused solely on his state of mind and potential motive for the shootings, they were not improper. Although the questions mentioned Aliwoli's race and religion, none of them can be reasonably viewed as attempting to arouse jury prejudice towards blacks or Muslims. In short, there is no evidence that these comments were intended to play upon the prejudices of the jury. See Hernandez, 865 F.2d at 928.

In any event, looking at the record as a whole, the questions could not have impacted the outcome

of Aliwoli's trial. First and foremost, every witness the prosecutor asked about whether Aliwoli's black Muslim faith could have motivated the shootings denied that Aliwoli's religion played any role in the crime. Rather, each witness characterized black Muslims as peaceful and law-abiding citizens. The expert witnesses consistently attributed Aliwoli's actions to his persecutorial delusional disorder and emphatically denied that he shot the police officers because of any religious belief. Having obtained no testimony to substantiate its theory that Aliwoli's motive was based on zealous religious beliefs rather than his delusions, the prosecution never mentioned Aliwoli's race or religion during closing arguments. And, as we previously noted, the State presented highly persuasive evidence showing that Aliwoli was aware of his actions when he shot the police officers. Finally, we note that the trial court properly instructed the jury to disregard Aliwoli's race and religion when reaching its verdict. The prosecutor's questions did not deprive Aliwoli of a fair trial./2

   The district court is affirmed.


/1 Aliwoli also complains about another statement that the prosecutor made during rebuttal argument. We will not consider this statement because it is the same argument that we previously found procedurally defaulted. See Aliwoli, 127 F.3d at 634.

/2 Aliwoli also argues that he was deprived of a fair trial because the prosecutor attacked his credibility during closing arguments. We find no error here; there was ample evidence for the jury to reasonably conclude that Aliwoli did not tell the truth.


 ROVNER, Circuit Judge, concurring in part and dissenting in part. Like my colleagues, I do not believe that the questions centering on Aliwoli's race and religion deprived him, in the end, of a fair trial. The questions themselves are troublesome. Certainly, the State was entitled to explore plausible explanations for this crime other than insanity. Yet, there is nothing in the circumstances of the offense, or elsewhere in the record, that suggests Aliwoli's race or religion actually might have played a role in his attack upon the three police officers. The closest thing to it is a statement by family members, recounted in a report of Aliwoli's psycho-social history, that "although a Muslim, he did not seem to be excessively hostile towards whites." R. 506. This is a slender reed, if it is any support at all,

for a series of questions aimed at establishing that Aliwoli, as a Black Muslim, might have distrusted the police and viewed Caucasians as "white devils." E.g., R. 587-88. The literature that the prosecutor also cited as a basis for these inquiries (e.g., R. 586, 712) offers no more justification. In a society that is highly conscious of racial and religious differences, it comes as no surprise that there may be tension among peoples whose skin colors and houses of worship differ; and many, if not most, races and religions can lay unhappy claim to members who promote distrust of, and even violence against, persons of other races and religions. But to ascribe to a defendant a motive to kill simply because he is a Black Muslim and because other African-Americans, or other Muslims, have expressed distrust (or worse) of different races and religions, is to engage in wholly inappropriate stereotyping. I think that the questions posed in this case may, in some instances, have come close to such stereotyping, rather than focusing on what the defendant himself believed. Nonetheless, like my colleagues, I conclude that because the witnesses uniformly rejected the notion that Aliwoli's race or religion may have supplied him with a motive to harm the police officers, and because the State refrained from pursuing this theory in its closing arguments, Aliwoli was not deprived of his constitutional right to a fair trial.

What did deprive him of that right, in my view, was the prosecutor's assertion, in closing argument, that the defense was attempting to "flimflam" the jury by asserting that Aliwoli was insane "so that he can go laughing out the door of this courtroom." R. 587. The message that the prosecutor intended to convey is unmistakable: "Find him not guilty by reason of insanity and he will go free." The remarks were not only improper in the sense that they invited the jury to consider the sentencing consequences of its verdict, see Shannon v. United States, 512 U.S. 573, 579, 114 S. Ct. 2419, 2424 (1994), but also in the sense that they suggested, inaccurately, that an insanity finding would necessarily set Aliwoli free, see Ill. Rev. Stat. ch. 38 para. 1005-2-4 (1987), now codified at 730 ILCS 5/5-2-4. Only the trial judge could have corrected the misimpression that the prosecutor planted in the jurors' minds, but he declined to give a proffered instruction that would have explained to the jury the true consequences of a not guilty by reason of insanity verdict. See Shannon, 512 U.S. at 587-88, 114 S. Ct. at 2428 (noting that such an appropriate corrective instruction may be required when the prosecution suggests that the defendant will "go free"). True, the defense had the opportunity to argue in its own closing that

an insanity verdict would not set Aliwoli free, but why would the jury have believed his attorney? The fact that the trial judge overruled the objection to the prosecutor's remarks, and allowed the State to sound the same refrain in rebuttal, see R. 890, 892,/1 if anything imbued this line of argument with credibility. The assertions that the defense was engaged in trickery and deceit, e.g., R. 857, 888--again, objected to but nonetheless allowed-- would only have reinforced the notion that the defense would achieve total victory (i.e. freedom for Aliwoli) in an insanity finding, although I agree with my colleagues that the assertions of trickery do not support relief in and of themselves. The standard instructions indicating that it was the judge's responsibility to deal with the question of punishment, and that the attorneys' arguments were not evidence, did absolutely nothing to clear up the problem. As my colleagues point out, there was indeed evidence that Aliwoli acted in an apparently sane manner (ante at 5). Yet, there was also considerable evidence that he was mentally disturbed, and the jury's determination that he was mentally ill confirms the weight of that evidence. Given that the prosecutor's misleading arguments as to the consequence of an insanity verdict were never corrected, and that the jury opted for a middle-ground finding that he was guilty but mentally ill, I cannot say with any confidence that the error in this case was harmless. In that respect, then, I respectfully dissent.


/1 I recognize that Aliwoli has procedurally defaulted any claim based on the remarks made in rebuttal, see Aliwoli v. Gilmore, 127 F.3d 632, 634 (7th Cir. 1997), but these remarks nonetheless bear on the prejudicial impact of the remarks made in the prosecution's initial closing argument.